Ranney, J.,
dissenting.
In the month of December, 1852, the property of the plaintiff, a. resident of Muskingum county, was taken and sold by *the defendant ; and he now prosecutes this suit to recover the amount of money arising from the sale, received and still held by the defendant. The defense rests upon this state of facts: On the 24th day of March, 1851, the general assembly of this state passed an act. to authorize the county of Muskingum to subscribe to the capital stock of the Cincinnati, Wilmington and Zanesville Railroad Company, upon the condition that such subscription should be first approved by a majority of the qualified electors of the county, to be-ascertained at an election held upon notice, for that purpose. This-vote was taken on the 14th day of October, in that year, and a majority voting in favor of the subscription, the commissioners, on. the 25th of the same month, subscribed one hundred thousand dollars, in the name and on behalf of the county, to the stock of the-company; and on the 12th of June, 1852, levied a tax to pay the interest this subscription. The plaintiff refusing to pay the- *542 levy upon his property for this purpose, the defendant, then treasurer of the County, and having the duplicate in his hands for collection, seized and sold the plaintiff’s property, and made the amount ■charged against him therefrom.
No question is made as to the regularity of these proceedings, provided the law continued in force when they were had; but it is claimed, and I think with entire success, that the authority to make the subscription and levy the tax ceased and was absolutely revoked, upon the taking effect of the present constitution of the state, on the 1st of September, 1851.
A majority of the court having come to the opposite conclusion —a result, in my judgment, subversive to a great extent of the principles and policy established by some of the most important provisions of the constitution, designed to prevent a gross abuse of the taxing power, I deem it my duty to state, in such detail, as to be definitely understood, the grounds upon which I dissent from the judgment given in this case.
It is in no way difficult to understand the precise situation of things at the time this constitution took effect. * After the adoption of the constitution by the convention, and while it was pending before the people for ratification, the act was passed. Nothing further was done until it had been ratified and, in pursuance of its provisions, had taken effect.
Then followed in succession the vote, the subscription, the tax, and the levy and sale of the plaintiff’s property. The law depended for its validity upon the constitution of 1802, and while that in■strument continued in force, and measured the. extent of political power with which the government was invested, it has been settled to have been a constitutional and valid law. A law, however, not conferring complete authority to bind the county by a subscription, but dependent for its execution upon the condition that such subscription should be first approved by a majority of the electors.
That constitution was abrogated when the present took effect, .and with it. I insist, fell every particle of legislation inconsistent with the grants of power contained in the one that took its place-.
In other words, what can not now be done by the government in virtue of its own inherent power, and under its own legislation, ■can not continue to be done under authority of legislation enacted •under the former constitution, and in force at the time the present •constitution -took effect.
*543 Such legislation and the constitution can not stand together, and both have effect, and they are therefore inconsistent—opposed to each other: and in such case, no one doubts that the prior, inferior law must give way to the latter, superior constitution. ‘
I think I shall be able to make this very manifest, but before making; the attempt, to avoid misapprehension which might arise from the generality of the proposition, I should say that the prin•ciple does not necessarily cover the mere forms or course of proceeding necessary to be observed in the enactment of law;s.
These relate only to the manner of executing the power, and have present application for that purpose, and where the same end can still be attained, by the observance of other *or additional requisites, or by another course of proceeding, it may well be that laws passed when these were not required, would still continue in force.
Much less does it operate to impair, or in any manner affect rights of j>roporty acquired or vested on contracts made under such legislation while it continued in force. The repeal of a law never has that effect, 1 Ohio St. 565 ; but aside from the general rule, the constitution, in the most explicit language, has extended its protection to all such rights of property, and the moment it took effect, placed the seal of inviolability upon them.
But neither of these considerations intervene to embarrass the present case. It is not protended that a law, in any form, could have been passed since September 1,1851, to authorize the proceedings relied upon as a defense; and it is very properly admitted by the defendant’s counsel, that there was at that date, no rights vested in any one, either by contract or otherwise, to be interfered with by the repeal of the law.
Up to that time there was nothing but a simple, naked, conditional power given to the commissioners to make the subscription.
If this naked power was then revoked, and ceased to exist, it inevitably follows that the subscription was made, and the tax assessed, without authority of law; and they can, therefore, furnish no justification for taking the plaintiff’s property.
Before adverting to the particular provisions of the constitution with which the continued exercise of this authority, in my opinion, became inconsistent, I may be permitted to refer to a few genera] principles, in the light of which they should be read and considered. If these principles should be regarded as too elementary and radical *544 to be introduced into a judicial opinion, or so old as to have become obsolete and unfashionable in this fast age, I hope the offense against good taste may be at least somewhat mitigated, when it is remembered that they have always been deemed of sufficient importance to find a place among the fundamental laws of the state; and to be-characterized by our ^fathers, as the “ groat and essential principles of liberty and free government ” to which “ a frequent recurrence,” “is absolutely necessary, to preserve the blessings of liberty.” Art. 8, sec. 18, const. 1802.
First amongst them in order, and first also in importance, is the' great political truth, that sovereignty belongs only to the mass of the community; or, as expressed in the bill of rights (sec. 2), “all political power is inherent in the people.” In extended communities, for obvious reasons, the direct exercise of this power becomes, impracticable; and this has led to the institution of a subordinate agency called the government; intrusted for the time being, with the exercise of such sovereign power, and such only as is clearly expressed in the instrument of delegation—the constitution. This-seems very plain, and almost too plain to need this formal statement ; and yet it is forgotten or disregarded, as often as the argument is advanced, that a legislative act can only be treated as inoperative when expressly prohibited by some clause or section of the constitution. The question can never be, what might the people, the source of sovereign power, have done or authorized to be done in their name and behalf; but what have they authorized to be done ? As well might any other agent, acting under written instructions, claim to be authorized by his principal, to do whatever he was not expressly prohibited from doing, however foreign it might be to the powers actually conferred. Hence, this court has held : That it is always legitimate to insist that a legislative enactment, drawn in' question, is invalid, either because it does not fall within the general grant of power to that body, or because it is prohibited by some provision of the constitution; and if the former is made to appear, it is as clearly void as though expressly prohibited. 1 Ohio St. 86.
2. It-will not be doubted in the face of the second section of the' bill of rights, or even without it, that the people have the absoluto right, at any time, to resume any portion or all of the political power they had previously delegated, and to construct their government anew, upon such principles *and with such powers as to them shall seem conducive to their happiness and safety.
*545 3. If these principles are correct, and they seem to me nearly self-evident, they enable mo to assume, without a possibility of mistake, that upon the taking effect of the present constitution, all such power previously given, as is not expressly, or by fair implication, delegated to the present government by that instrument, then returned to its source and now remains with the people : and this not only as the natural result of these principles, but by the positive provisions of the constitution; section 20, of article 1, expressly declaring, that “ all powers, not herein delegated, remain with the people.”
Since September 1, 1851, therefore, this constitution and the constitution of the United States, in their several grants of power, contain every particle of political sovereignty that the .people of this state have authorized to be exerted in their name or behalf, over the person or property of any citizen ; and by way of express limitation upon their own powers, they have ordained that no other or further power shall be exerted, even by themselves, except in the mode prescribed for an amendment of these instruments. When an ajipeal is made to the guaranties they afford, against any act of the government' the question must always be, is the power-delegated or not? and in tracing the dividing line between authority conferred and reserved, they should, like every other written instrument, be construed according to the natural import of the language employed, in view of the objects and purposes intended to be accomplished, without any attempt to enlarge the grant from considerations of convenience or necessity:—reasons always advanced by tyrannical rulers to justify usurpation of power, but utterly destructive of all representative government, based upon constitutional limitations.
In the light of these principles, let us now ascertain what powers, applicable to this inquiry, were conferred upon the general assembly by the constitution of 1802; what evils *an experience of half a century had developed; and what remedies for their suppression the present constitution has provided. The spirit and object of its provisions will be thus made apparent; and the duty unquestionable, to so construe it as to suppress the mischief and advance the remedy.
1. The powers of the general assembly, under the old constitution, were made the subject of investigation and decision by this court in the case of the Cincinnati, Wilmington and Zanesville *546 Hailroad Company v. The Commissioners of Clinton County, 1 ■Ohio St. 77; and it was there held that the general grant of “legislative authority,” contained in that instrument, conferred the power ■of providing by law for the construction of works of internal improvement, by the employment of any appropriate means adapted ■to the end in view, and not prohibited by the constitution; and as ■no limitation, whatever, was there found, that corporations might be created for the purpose, and counties, cities, and towns might be authorized, as subordinate agencies in the hands of the legislature, to construct, either in whole or in part, by subscribing to the stock of such corporations, those of a local character, having especial relation to their business and interests. That in this manner, and for these purposes, debts might be contracted, and taxes levied to ■pay them ; and while this court then entertained and expressed the unanimous opinion “that such laws involved a gross abuse of the taxing power,” yet, as the constitution fixed no limit to the discretion of the general assembly upon a subject settled to be within its control, it was thought to be an evil beyond the reach of judicial correction.
2. The results of this unlimited power were most disastrous. It had borne the bitter fruits of impaired public credit, wasteful expenditure, and a large state debt; followed by onerous taxation, already endured for years, without prospect of being materially diminished for many years to come. When money could no longer be borrowed upon the credit of the state, a new and still more dangerous expedient *was resorted to, under the influence of the railroad mania, for increasing the public burdens to an unlimited amount, and involving the municipal divisions of the state in all the frauds and disasters of private corporations, by authorizing the counties, cities, and towns to subscribe to the stock of such companies. Laws for this purpose were passed, without, investigation or reflection, whenever desired by the representation of the locality to be affected, and favorable votes generally obtained; often under the fallacious expectation that small towns were thus to bo made cities; and through the interested pressure created by the depot bwners, stock-jobbers, and railroad officers. Private, property was thus, in effect, placed at the mercy of irresponsible, local majorities; neither under the control of the owner, nor subject to the disposition of the sovereign power of the state, when its *547 appropriation for public purposes was found to be necessary by its whole representation.
With this strong tendency to bankruptcy and ruin, both of money and principle, the convention was called to revise the constitution. '
Intelligent and reflecting men everywhere, demanded a remedy for these growing evils; not by interfering with rights already acquired, or obligations already incurred; but by an effectual reduction of the powers of government, and unequivocal limitations upon its capacity for future action. The convention, in my opinion, has met this demand, in a manner entirely consistent with the public expectation and interest, and in strict accordance with sound principles; and has effectually disabled the state, and all its subordinate divisions, from incurring any debt whatever, for purposes of internal improvement, and especially from becoming stockholders in, or loaning their credit to, any joint-stock company or corporation, or association whatever, unless, indeed, “written constitutions are absurd attempts, on the part of the people, to limit a power, in its own nature illimitable.”
3. In giving effect to this policy, we find it declared (art. 1, sec. 19), that “private property shall ever be inviolate, *but subject to the public welfare,” when compensation is made to the owner in money (art. 2, sec. 28), that “the general assembly shall have no power to pass retroactive laws, or laws impairing the obligation of contracts; ” and by art. 8, sec. 7, the faith of the state is solemnly pledged for the payment of the public debt, and ample provisions made for its liquidation as it. becomes due. All these important guaranties were given, to provide against any interference with existing rights and interests.
To enable the government to meet certain other pressing emergencies that might arise, the state is authorized by the first and second sections of the eighth article, under the limitations and restrictions therein expressed, to contract debts to supply casual deficits or failures in revenues; to meet expenses not otherwise provided for, to repel invasion, suppress insurrection, defend the state in war, or to redeem the present outstanding indebtedness of the state.
The 3d section of the same article then provides: “ Except the debts above specified, in sections one and two of this article, no *548 debt whatever shall hereafter be created by, or on behalf of the state.”
“ Sec. 4. The credit of the state shall not. in any manner, be-given or loaned to, or in aid of, any individual, association, or corporation whatever; nor shall the state ever hereafter become a joint owner, or stockholder, in any company or association in this-state, or elsewhere, formed for any purpose whatever.
“ Sec. 5. The state shall never assume the debts of any county, city, town, or township, or of any corporation whatever, unless-such debts shall have been created to repel invasion, suppress insurrection, or defend the state in war.”
And again, in the article on finance and taxation (art. 12, see.. 6), still bearing in mind that the embarrassments of the state had mainly arisen from indebtedness incurred for internal improvements,, and apparently to make assurance doubly sure, it is declared: “The state sha-ll never contract any debt for purposes of internal improvement.”
*The chief object and effect of these provisions, in their, application to the state government, are too manifest to require-comment. In the most explicit and cogent language, they prohibit the state from contracting or assuming, either directly or indirectly, any indebtedness whatever, except for the purjwses allowed in sections 1 and 2 of article 8; and section 4 of article 8 is-equally explicit in denying the right of the state to become a joint owner or- stockholder in any company formed for any purpose-whatever. The moment the constitution took effect, all legislation then existing, authorizing the creation of any such -liability, it is admitted, was instantly repealed and the authority revoked. But it is claimed that these sections only operate to restrain the-state government, as the representative of its sovereignty, from assuming liabilities to bind the whole state, while they leave its-political divisions, under authority of law, free to construct public improvements, and if necessary and deemed expedient, to incur any amount of indebtedness for that purpose.
It is wholly unnecessary in the decision of this case, to determine this question ; since the particular form of indebtedness here attempted to be incurred, is, in my opinion, expressly prohibited by section 6 of article 8, to which I shall particularly allude in the further progress of this opinion; and I have introduced the sections already quoted' chiefly for the purpose of showing the great *549 -care evinced by the convention, to put a final end to what was justly regarded a formidable evil. But if the position is tenable, it must be admitted the constitution contains no guaranty whatever to the tax-payers, against being involved in indebtedness to any extent, for internal improvements, through the medium of the counties, except in the particular mode of loaning their credit, or subscribing to the stock of corporations. I am, therefore, unwilling to pass it in silence, or to suffer the opportunity to escape without saying that I am very far from yielding it my assent. I should hesitate long before coming *to the conclusion that the great object of these provisions could be thus easily and obviously evaded.
I may admit that the precise import of the language employed, when the letter is only regarded, may be open to this narrow construction. But the construction of a penal statute, and a remedial legislative enactment, or constitutional provision, involve very different-considerations; and this case, throughout, furnishes .another and forcible illustration of the absolute necessity, in the .latter class of cases, of comprehending, clearly, the spirit and object of the provision, and of holding that cases within its equity are included within it, and governed by it. However sagacious and intelligent legislators may bo, no human intelligence can foresee the infinite variety of circumstantial variation that may arise in cases to which the reason of the rule extends; and however voluminous .a code of laws may be, such cases can never all be subjected to .a precise description.
If this be true of statutory enactments, how eminently so of con-stitutional provisions, necessarily expressed with brevity, and de.signed to declare great principles in the fewest possible words. To the judicial tribunals belong the duty of applying these principles to individual cases; often a work of difficulty, and requiring the exercise of the highest powers of judgment and discrimination; and in the discharge of this duty, the polar star to guide the judicial mind, should be the object intended to be accomplished by the provision ; and it should be so construed as to preserve this in full vigor, unimpaired by evasion, although in doing so the letter may not be strictly adhered to.
Now, what object was intended to be accomplished by prohibiting the state from contracting “ any debt for purposes of internal improvement?” The answer is plain, palpable, and undeniable, *550 that it was designed to protect the people of the state from the delusion, embarrassment, and onerous taxation to which they had before been subjected. It was not the state as a mere ideal abstraction, unconnected with her *eitizens and her soil, that needed protection; but the state as composed of her people, and their territorial organizations of towns, cities, and counties of which it was made up.
It was not the name of a- state debt against which it was intended to guard, but the burdens which such a debt imposed upon the-property of the citizens of the state. It was not the particular form in which the liability might bo incurred, or whether its payment, was imposed upon all or only a part of the people; but it was intended to give every citizen a constitutional guaranty that no debt was to be contracted for that purpose, which might ultimately involve taxation for its payment, and to afford him a sure protection against the unwelcome visits of the tax-gatherer calling for money to pay such indebtedness, that this section was inserted. Upon any other construction it is scarcely worth the jiarchment upon which, it is written. For, if the legislature may authorize one county to incur such indebtedness, it may authorize all: and if it may authorize them to do it, it may, with still less doubt, require it to be done. And in this way, a debt to any amount may be contracted under-its authority, for a prohibited purpose, with its burden imposed upon all the property and citizens of the state, and subjecting them to the same oppressive taxation as though the payment of the whole was assumed directly by the state. The provision would thus-wholly faily fail to effectuate its manifest and substantial objects, and its protection be reduced to amere shadow; since it would matter little to the tax-payer whether his property was taken to pay a. debt for that purpose, nominally incurred by the county or the-state.
The construction for which I contend is entirely consistent with the language of the section, and, I think, demanded as the result of principles already settled in this court. The legislative power of the state, in the exercise of sovereign authority, can alone authorize the construction of internal improvements. A county is invested with no single attribute of sovereignty, and under the constitution, can not be. When its organization is employed for carrying into effect a law of *that character, it is used as amere instrumentality, a means in the hands of the legislative power, to *551 accomplish its purposes, and can do nothing but execute some subordinate function. 1 Ohio St. 89, 95. In virtue of its own powers, therefore, a county can not construct these improvements, and, of course, can not contract a debt for the purpose. If a debt is contracted, it must, from the nature of the thing, be contracted by the state through its legislative department, whether the payment of the debt is imposed upon the state or the county, or, in the latter case, whether it is voluntarily assumed by the county or forced upon it. What the state can not do directly, .it certainly can not do indirectly. Constitutional and statutory provisions and legal rules, would become little less than a burlesque, if they possessed so little vitality as to be subverted and made powerless by indirect attacks upon the principles they are established to sustain.
Now, it is positively declared: “ The state shall never contract any debt for the purposes of internal improvement.”
It is by no means clear, that the precise language of the section is not invaded, when a debt is authorized or commanded by the law-making power of the state, for this purpose, although its burden is cast upon one or more counties. But if it is not, is it not a sheer and palpable evasion of the spirit and purpose of the provision, to allow the same object to be attained by the use of the interdicted means, imposing the same burden upon a part or all of those intended to be protected, and followed by the same oppressive' taxation ? I think it is ; and such was evidently the opinion of the court of appeals in Kentucky, in the case of Slack et al. v. Maysville and Lexington Railroad Co., 15 B. Mon., upon a provision of the constitution of that state, much less explicit than this, although it did not become necessary in that case, definitely to settle the question. If it is so, and if the constitution, in protecting the people of this whole state from this evil and oppression, has necessarily protected all its organized parts, and every individual citizen, it follows that this attempt to create a debt for internal improvements, under ^legislative authority, is inoperative and void, as it stands confessed that this provision of the constitution was absolute and imperative from the time the instrument took effect.
If this is not the true construction, the next fitful fever that seizes the legislative body, may, with the utmost facility, plunge us into another twenty million debt, and call for another half century’s in-durance, by apportioning its burden upon the counties of the state, and calling it the debt of the counties, instead of a state debt, not *552 withstanding the utmost anxiety is everywhere apparent, to prevent such a result.
From this digression—unexpectedly long, but still, I submit, not foreign fco the question—I return to section 6 of article 8. It pro-provides : “ The general assembly shall never authorize any county, ci fcy, town, or township, by vote of its citizens or otherwise, to become a stockholder in any joint stock company, corporation, or association whatever; or to raise money for, or loan its credit to, or in aid of, any such company, corjioration, or association.”
After this section was in full force, as the supreme law of the land, the county of Muskingum, through its commissioners, attempted to become a stockholder in a corporation, and the tax upon which the plaintiff’s proj)erty was taken, was levied to pay the interest upon the stock so subscribed. Two propositions may be set down as unquestionable: 1. No binding subscription could have been made without legislative authority; and, 2. No such authority could have been given by the general assembly, after the present constitution took effect. The question is thus reduced to a single point: Hid the authority previously given continue in force until the subscription was made, or was the law conferring- it inconsistent with this constitution and repealed by it when it took effect? Section 1 of the schedule provides: “All laws in this state, in force on the 1st day of September, 1851, not inconsistent with this constitution, shall continue in force until amended or repealed.”
*A position is here taken by the plaintiff's counsel, that it does not seem to bo important to consider. It is claimed that, but for this provision, all legislation enacted under the former constitution, would have fallen upon its abrogation ; and that the question, therefore, is rather one of express continuance than of implied repeal. Let this be so ; and yet, it is certain that all laws not inconsistent are expressly saved, and equally certain that those inconsistent -would have fallen, if nothing had been said. , All consistent legislation is, so to speak, ingrafted by this provision upon the constitution; but no attempt is anywhere made to disturb the harmony of its action, or the operation of its principles, by giving temporary or perpetual life to laws that must have that effect. The whole argument of those who insist upon the continued validity of this legislation, proceeds upon a literal reading of section 6 of article 8, and the inference from it is based upon the fact that the indebtedness and taxation which such laws authorize, are not, in *553 words, prohibited. It is claimed to be prospective in its language, -operating only upon the law-making power created by the constitution, and designed to prevent any further legislation of the kind, while it leaves that previously enacted to be executed, until repealed by the legislature. What I have already said of the admissibility of a literal construction, which does not preserve the spirit and purposes of the constitution, is especially applicable here, but need not be repeated.
The conceded fact that the government created by the constitution, is expressly prohibited from constructing internal improvements, or attaining any other end, by such means, is all I demand for present purposes. If the necessary legal effect of that fact, is to disable it from using previous legislation for the purpose, it will not be doubted that the powers conferred upon the county by the law “under consideration, were as effectually revoked as if it had been expressly repealed.
From the nature and structure of our political system, sovereign or political power is necessarily divided into two *parts; the one embracing that part delegated to the government, and the ■other that retained by the people. The constitution, as I have before said, defines the extent of the delegation, and affirms the fact that all other powers not therein delegated “ remain with the people.” While the constitution remains unchanged, no undelegated power can be exorcised to bind the state or affect the person or property of any citizen. This classification “ includes all the politi-cal power inherent in the people,” as the source and fountain, of sovereignty, and excludes the possibility of a third description of power, not delegated, and yet not retained—not conferred upon the .government, and yet capable of being exercised by it. Nor, in determining the extent of the grant, is it of any importance to attempt to distinguish between such powers as lie entirely outside of the boundary of “ legislative power” and such as are excluded from it by qualifications, restrictions, and limitations found in other parts -of the instrument; the effect of them, all beiDg to narrow the limits of the delegated, and to enlarge those of the reserved powers.
And wherever the lino is thus made to fall, it effectually separates the powers allowed to be exercised by the government, from those falling without its sphere of action, and thus placed beyond its control. Now, when is a legislative enactment inconsistent with the constitution? Plainly and unquestionably, when it authorizes or re *554 quires the exercise of some undelegated power, whether such power is reserved from the grant by not falling fairly within the scope of legislative authority, or is carved out of it by some express limitation or restriction. To make its execution consistent with the con stitution, what it authorizes or requires to be done, must fall within the powers conferred upon the government by the constitution; and the enactment must be such as could, consistonly with what it grants and what it withholds, flow out of it. The true .test, therefore, is the one I have before indicated; a law that could not now be passed and executed, consistently with the constitution, can not continue in force and be executed consistently with it. It is but uttering ^truisms to say, that the laws consistent with the constitution may still bo enacted, and those of the same character enacted before it took effect, may still continue in force; while those of either class inconsistent with it, are inoperative and void.
And yet, with the fact confessed that if this very law had been copied and passed since the 1st day of September, 1851, it would have been entirely inconsistent with the constitution, and therefore a nullity; the conclusion, unaccountable to me, is reached that it may still continue in force and be executed after that time quite consistently with that same constitution, although it demonstrably authorizes the same liability to be incurred, the same burdens imposed, the same taxes levied, and the same corrupt intermingling of public and corporate interests in either case. I will not say that of two laws having the same object and couched in the same language, the one may not bo consistent and the other, at the same time, inconsistent with the same constitution; but I can with truth say that such a result is beyond my comprehension. To my understanding, laws passed before the constitution took effect, and those passed since, are to be tried by the same rule; and the true question in either case is, has the government been invested by the constitution with power to execute what they authorize or require to be done? If it has, they are valid; if otherwise, they are necessarily in conflict with the constitution, and fall to the ground.
An apt illustration of those positions is furnished by the case of Park v. The State, decided at the present term. A law was in force when the constitution took effect, allowing the accused in capital eases to elect to bo tried in the Supreme Court. After its adoption, all laws imposing duties upon or granting powers to the Supreme Court, under the former constitution, were, by the act of February *555 19, 1852, “relating to the organization of courts of justice and their powers and duties,” extended to the district court, and the like jurisdiction, powers, and duties conferred upon that court.
*Parks elected to be tried in the district court, but his motion to certify the proceedings was overruled; and we hold, correctly, for the reason that the law allowing the election was inapplicable to, and inconsistent with, the constitutional organization of that court, it not being invested by the constitution with power to-exercise original jurisdiction, although it was not expressly prohibited from doing so. This decision was based upon the distinct ground, that power not expressly or by necessary implication conferred upon any department of government, is denied; and while the charge involved the life of the party, and we all felt the propriety of trying such cases in a court somewhat removed from local influences and excitements, we could find no power in the district court to exercise the jurisdiction. The power in that case was judicial ; in this it is legislative; in that case it could not' bo exercised,, because it was not conferred; in this, it is not only not conferred, but expressly prohibited.
Although the Glinton■ county case was wholly controlled by the constitution of 1802, yet the principles upon which the decision is-founded are, in my judgment, entirely fatal to this defense. The-corner-stone upon which the opinion is based, is found in the fact that the General Assembly was invested with express authority to- . construct internal improvements, and unrestricted in its choice of instrumentalities and means to attain the end. A county, it was-held, might be employed as such instrumentality, and 'indebtedness- and taxation as lawful means, at the time the power was exercised and the obligation incurred by the subscription.
But everything was made to depend for its -validity and force, upon the exercise of the sovereign power with which the legislative-body was clothed at the time the acts were done, and which it could neither delegate nor.surrender.
Here the same acts are attempted to be performed, and the same-obligations incurred, under the legislative authority of a government, not thus unrestricted in its choice of means, but expressly prohibited from authorizing what has actually been done. .
*Under color of these proceedings, the plaintiff’s property has been taken against his consent. He appeals, as is his right, to-the pledge of inviolability given by the whole people in the con *556 •stitution, and demands redress. When lie is answered that his property has been taken for a tax levied to pay a subscription made by Muskingum county to the stock of a railroad company, may he not well say, as we have said, that “the power to tax is one of the highest attributes of sovereignty ” (1 Ohio St. 273); that at the time this subscription was made, and the tax assessed, the government was invested with no power to authorize it, but, on the contrary, .all such power, previously delegated, had been reclaimed by the people, and was then held by them amongst the reserved powers of sovereignty, and incapable of being exercised by any department ■or officer of government; and that the defendant must justify, if he ■can justify at all, under the living government, whose officer he is, .and whose powers alone he can execute; and not under one that had been defunct and out of existence more than a year when he •committed the act complained of.
But it is claimed to have been intended by the convention in framing, and the people in adopting, the constitution, to allow such laws of this character as were then in existence, and such as might bo passed before it went into effect, to remain in force and be carried into execution. That it was not intended to interfere with rights acquired and interests vested, under such legislation, or, indeed, by any other, I am quite ready to admit; and much care has been taken to express that intention, and to make it effectual; but that it was sirpposed, by any considerable number, in or out of the convention, that votes would continue to be taken, and new obligations incurred, after the constitution had taken effect, I do not believe; nor have I yet seen the least particle of evidence to make it probable. Not a word or syllable in the constitution itself, or in the history and character of the evil, gives the least countenance to such an idea. The debates of the convention have been cited in argument, but aside *from the fact that, when taken together, they make nothing' for the position, I have the authority of this court in the Exchange Bank v. Hines, for saying, that very little reliance is to be placed upon them in determining the proper construction to be put upon a constitutional provision.
That the convention might, if they had seen fit, have nullified their own work, and have left the instrument they were’ a dopting .at the mercy of a legislative body then in session, while they were ■evincing the utmost solicitude to limit the power of the one to assemble under its provisions, I am not disposed to doubt; but, *557 surely such incredible fatuity and inconsistency are not readily to be ascribed to them. The evil they were attempting to suppress, was such an one as this court has felt authorized, unanimously, to declare a gross abuse; and is it to be supposed that it. was intended to provide for a partial continuance of a gross abuse, when its instant correction would interfere with no right or interest of a single human being? 1 must think not.
' Returning, then, to the provision itself as its own best interpreter, what are we authorized to say was intended by it ? I certainly can not err in asserting that it was intended to have its full' legal effect. A prisoner on trial for crime, would be told, and told correctly, that he must be presumed to have intended the natural and probable consequences of his own act, although his life or liberty might depend upon it. And here, when the people, by their-own act, reclaimed and took to themselves, and made incapable of exercise, every particle of sovereign authority, that had given vitality to such legislation—abolishing the government that had been invested with it, and disabling the one they put in its place from exercising any such power, they must be presumed to have-intended the necessary and inevitable consequence of thus sapping-the very foundation on which such legislation rested, and destroying the capacity of the agent upon whose sole authority it could be carried into execution. Indeed, from the whole instrument, and the necessary effect of its several provisions bearing upon this-subject, the intention, in my opinion, is perfectly manifest, to meet and honestly and honorably *pay, every liability that had been incurred under this vicious and dangerous system of legislation ; but absolutely to prohibit the creation of any more. In that way, the errors of the past are made to work no injury to-private right, and the honest policy of the ■ constitution is vindicated in the future.
But, again, it is said, the convention was called to amend, and not to overturn the old constitution and the legislation under it— to reform the government, and not to abolish it; and that this is the same organized state since the adoption of the new, as before, with the same people, the same territory and the same essentia] interests. Iam happy in knowing that it is, indeed, the same-state, embracing the same people, and the same territory (and with all its mistakes, a better could hardly be desired) ; but it is cause of still felicity to be able to know, that no public function *558 .ary, or all combined, can here utter the vain hoast—“ I am the .state.” If an individual were to revoke the powers he had given to his agent, when found to be incompatible with his interests, and before execution, and should delegate less power to another, and more carefully guarded against abuse, I suppose, it would not be ■difficult to comprehend how he might still continue .to be the same man, probably somewhat improved by experience; nor would it be thought that the new agent could exercise the enlarged powers -of his predecessor, and commit the very abuses against which his principal intended to guard. Hor is it more difficult, when the •state is regarded as an aggregation of men, united for common defense and general welfare, and government an important agency ■created by them, the more conveniently to secure these objects, to see how the delegated powers may be enlarged or diminished at their pleasure, or taken from one agent and given to another, and still the state maintain its identity, and essential character. And in this view of the subject, it is equally easy to understand how this governmental agency must, of necessity, be confined to the ■exercise of the powers thus conferred upon it.
*1 am aware that these views would find very little support in English books, or in what is called the theory of the British constitution, in which the parliament, composed of king, lords, and commons, is held to be omnipotent, and the people possessed only of such rights, and those very imperfectly secured, .as by force or humble petition, have, from time to time, been obtained from arbitrary rulers. But they constitute the theory of -our American systems, and enter into the very nature and structure of the constitution of Ohio; and can never bo lost .sight of, •or cease to be constantly applied, until we are prepared to admit that the people have np rights but such as their rulers see fit to award them.
Upon the whole case, therefore, I am of opinion, that the act under which these proceedings were had and relied upon as a jusr tification for seizing and selling the' plaintiff’s property, is inconsistent with section 3 of article 8 of the constitution, as it authorizes a debt to he “ created by ” the state, for a state purpose, although its payment is imposed upon a county.
It is inconsistent with section 6 of article 12, as it allows a debt to be contracted under authority .of the state “for purposes •of internal improvement.”
*559 It is inconsistent with section 6 of article 8, because it allows a -county, by a vote of its citizens, to become a stockholder in a corporation.
It is inconsistent with section 20 of article 1, because it requires the exercise by the existing government, of powers not delegated to it, but expressly “ retained by the people.”
And finally it is inconsistent with section 19 of article 1, as it authorizes private property to be taken without compensation or public necessity, and not in the exercise of a lawful taxing power; and being thus inconsistent, it was repealed by implication, when the constitution took effect, and is inoperative and void.
Other provisions of the constitution are also claimed to be infringed ; and undoubtedly it will be found, that so important an encroachment upon its fundamental principles, must disturb the perfection of its action in other particulars; but *1 can not extend this opinion, already too long, to notice them more particularly.
I sincerely hope I may be disappointed in my apprehension of the amount of mischief that may yet be done, under laws of this character, still upon the statute book, and not expressly repealed. Precisely how many there are, or what amount of indebtedness they authorize, no one seems to know; but they are known to be numerous, and to authorize a very large amount. Nor will they probably attract public attention, except as they are, from time to time, hunted up and drawn from their musty resting-places by speculators in stocks and town-lots; and, under the pressure of local excitements, imposed upon the counties, cities, and towns of the state; often by the votes of those especially interested, added to those who will bear very little, if any, of the burden assumed.
It is no answer to say, the legislature may, if it sees fit, repeal them. The people have not depended upon the legislature for protection. Sad experience had taught them that laws having local application, and imposing local burdens, seldom commanded the deliberate judgment of the whole representation of the state. They have, therefore, deemed it necessary to prohibit that body from authorizing this evil; and remembering that minorities wore as well entitled to protection as majorities, they have given each individual citizen a sure guaranty that his right of property shall not be invaded in that manner, or for such purposes.
*560 I say these things in no spirit of hostility to public improvements. I acknowledge their benefits, and am glad to see them liberally encouraged. -But all experience has shown public indebtedness to be the bane of free governments, and the principal source of their corruptions and oppressions. The constitution of Ohio-was, as I believe, with very necessary and limited exceptions, intended to prohibit the increase, in any form, of that then existing; and I am entirely unwilling to subvert its just policy, by so construing it as to impair its integrity, by suffering this policy to-be evaded.
*The government may still construct these works by raising the means to pay as it goes; and the history of the past fully demonstrates that they will be built by private enterprise and capital as fast as the investment is safe, and the business of the country will justify. If the counties and towns are to be crowded into-those of premature conception and doubtful expediency, and their interests made subservient to the large indebtedness usually incurred beyond the stock, it needs no prophet to foresee that -such works will very soon pass into the hands of the preferred creditors, the stock will be sunk, and the counties and towns left to pay up-their indebtedness by the most oppressive taxation ; or, what is not at all unlikely, to repudiate their obligations, notwithstanding the disgrace, corruption of public morals, and great individual loss sure-to result frond such a course.
Caldweíl, J., also dissented.